11th
Court of Appeals

                                                                  Eastland,
Texas

                                                                        Opinion

 

Lugene Demont Whaley

Appellant

Vs. 
Nos. 11-02-00215-CR, 11-02-00216-CR, & 11-02-00217-CR - Appeals from
Dallas County

State of Texas

Appellee

 

Lugene
Demont Whaley entered pleas of guilty to three separate indictments for
robbery, which are felonies of the second degree.[1]  The jury assessed his punishment in each
case at confinement for 15 years and a fine of $5,000.[2]  We affirm the three convictions.

                                                             The
Three Indictments

The first
indictment[3]
charged that, on or about December 26, 2001, while in the course of committing
theft, appellant threatened Robert Pierce and placed him in fear of imminent
bodily injury.  The second indictment[4]
charged that, on or about December 25, 2001, while in the course of committing
theft, appellant threatened Jerry Rhodes and placed him in fear of imminent
bodily injury.  The third indictment[5]
charged that, on or about October 29, 2001, while in the course of committing
theft, appellant threatened Jose Cruz and placed him in fear of imminent bodily
injury.

                                                               Relevant Testimony








Jose Cruz
testified that he was 31 years old, that he was married, and that he had two
children.  Cruz testified that he was
working in the early morning on October 29, 2001; that Mario Arrellano and
Vicente Garcia were working with him; and that all three of them were robbed
near Fair Park in the City of Dallas at about 7:00 a.m.  They had been loading tar into the back of a
truck.  The tar was for the roofing on a
construction site.  Cruz testified that
he picked appellant=s
photograph out of a photographic lineup, and he identified appellant as the
person who showed him a pistol and asked for his wallet.  Cruz testified that he was frightened and
that he and his friends let appellant and appellant=s companions take their wallets.  Cruz said that it Alooked like a real gun@ and that he thought that Aat any moment they could fire and kill [him].@  

Mario
Arrellano testified that he was 26 years old and that Asomething scary@ happened to him on October 29, 2001. 
He said that they were putting material into the truck when two men came
up to them and that one of the men had a gun. 
Arrellano testified that this experience had changed his life and that
he does not feel Asecure.@

Vicente
Garcia testified that he was 33 years old. 
At about 7:00 a.m. on October 29, 2001, they were loading some material
on the truck when Atwo
[men] came out with the gun in their hand and demanded our wallets.@ 
Garcia said that it was a Ascary thing@ and
that it changed his life.  He is Afearful@ when he goes on the streets.

Jerry Rhodes
testified that he was 25 years old and that he edited commercials for  television. 
Rhodes said that he had been with friends on Christmas Eve of  2001 and that he parked his car on the
street near Fitzhugh and Bennett Streets in the City of Dallas.  Rhodes identified appellant as the man who
approached him on the street at about 3:00 a.m. on Christmas morning, first
asking for directions, and then telling him to Aempty out all [his] wallets.@  Rhodes said that it looked
like Athere was something@ and that he thought appellant had a gun in
his pocket.  Rhodes said that he was Aterrified@ and that he did not know if he was going to see his family again.  Rhodes said that appellant took his cash,
cell phone, car keys, and checkbook.  








Robert
Pierce testified that he was 62 years old, that he had just had part of one
foot amputated because of medical problems, that he was on crutches, and that
he had gone out to his car to get some medicine at about 9:00 p.m. on December
26, 2001.  Pierce testified that, as he
got back into the hallway to the apartment, somebody grabbed him from
behind.  There were two of them, one was
jerking on the Alittle bag@ from Parkland Hospital that had all of his medications, one was
pulling on his hair, and they knocked his glasses off.  Pierce testified that it was a Apretty scary situation@ and that he Awas in a great deal of fear.@  Pierce said that, when he
started yelling, a neighbor across the hall stuck his head out the door.  Then Athey took off running.@  Pierce also said that he was
knocked down to the floor.  

Officer
Kelly White of the Dallas Police Department testified that he was working on
December 26, 2001, at about 9:00 p.m. when he saw a red Cadillac with three
black males.  Officer White testified
that he stopped the Cadillac for a traffic violation and that it fit the
description of a vehicle which had been involved in robberies in that
area.  Officer White called for Acover@ by another police officer. 
There were outstanding warrants on appellant and the other adult who was
in the car.  The officers searched the
vehicle and found a Daisy B.B. gun pistol and a cigarette lighter which looked
like a pistol. Officer White identified appellant as the driver of the
Cadillac.   

Detective
Phillip E. Jones of the Dallas Police Department testified about the statement
which he took from appellant.  The
written statement was signed and verified by appellant at 12:15 a.m. on
December 27, 2001.  Detective Jones said
that he gave all of the AMiranda@ warnings,[6]
that appellant seemed to understand those rights, that appellant dictated the
statement, and that appellant read the statement after it was written, making
some corrections before he signed and verified it as his voluntary
statement.  Detective Jones first read
the part of the confession where appellant talked about the Awhite guy on crutches.@ 
Appellant said in his statement that he stayed in the car while his two
companions Ajacked the man.@  Then Detective Jones read the
part of the confession concerning the robbery at 3:00 a.m. on early Christmas
morning.  Appellant said in this part of
his statement that they saw a Awhite guy standing near the sidewalk@ near Live Oak Street near some apartments, that both of them got out
of the car, that appellant=s companion had the Acigarette lighter looking gun,@ and that appellant took the man=s cell phone and keys.  Finally,
Detective Jones read the part of the statement concerning the robbery of the
three men in October.  Appellant said in
this part of his statement that his companion used Aone of the play guns@ and that they Atook their wallets.@  Appellant said in his
statement that they got a total of about $40 and threw the wallets away.  Detective Jones also read the part of the
statement where appellant said that he did not mean for anyone to get hurt,
that he had lost his job, and that he Aneeded cash to feed [his] kids.@ 








The State
rested, and appellant called only one witness. 
Appellant=s wife testified that he had never been
convicted of a felony and that she would help him meet the conditions of
community supervision.  Appellant=s wife testified that she did not know that
he had committed the robberies. 

                                                        Point
of Error

Appellant
presents only one point of error, and he argues the same point in all three
appeals.  That point reads in full as
shown:

The trial
court erred by overruling the objection to an improper jury argument by the
State.

 

                                                    The
“Objection” and the Argument

The point
of error refers to an incident during the State=s closing argument to the jury. 
After thanking the jurors and asking them to Aimagine what these victims must have been
through,” the prosecutor reminded the jurors that appellant had entered Aguilty” pleas to the three indictments.  The prosecutor also told the jurors why he
thought they should not recommend community supervision in these cases.  Relevant portions of the record  read as shown:

[PROSECUTOR]:
Now, I can...talk about some things I want you to think about back there.  Let=s think about robbery....Why do I think it does deserve a 20-year
sentence?

 

                                                            *   *  
*

 

Think
about the breaks we=ve
already given this guy.  Think about
punishment.  What are we looking at when
we=re looking at punishment?  Aren=t we looking at how much fear are you putting in the victims?  You tell me, folks, that he wasn=t using this as a deadly weapon, and putting
it in the minds of those victims that he had a deadly weapon, and he would kill
them.  That=s what we=re here about.  We=re here about the punishment, about the fear
of what it must feel like to have this stuck in your face or stuck to the side
of your head.  

 

                                                            *   *  
*

 

You can=t even go on the street at 7 a.m. and do your job without running into
this guy.  You can=t go out on...Christmas Eve with your buddies
anymore at night because he=s still prowling.  He=s prowling 24/7.  At 3 a.m. he=s out.  At 7 a.m. he=s out. 
You can=t even go to your car to get your medicine on
your crutches.

 

                                                            *   *  
*








Are you
telling me they don=t try
to make them scared?  This is a real
gun.  I=m going to shoot you.  Then
what?  To drive around and see a man on
crutches, a 62-year-old man on crutches. 
Well, you say to yourself, all right, robbery.  Well if they actually used the deadly weapon, it=s five to 99 years or life, if they used a
real gun, five to 99 years or life. 
Knocked off 80 (sic) years.  What
about, you say, well, what [if] the Defendant had a prior conviction, and then
it would be worse?  No.  Prior felony trip to the penitentiary, he=s still looking at five to 99 years or life
because it jumped up.  Then you say to yourself - - 

 

[DEFENSE
COUNSEL]:  Judge, that=s not true. 
It would be a minimum of 15 to life.

 

[PROSECUTOR]:  No. 
Second degree, bump to one, five to 99.

 

[DEFENSE
COUNSEL]:  He was talking about
aggravated robbery with a prior.

 

[PROSECUTOR]:  No, no, no.

 

THE COURT:
That would be 15.

 

[PROSECUTOR]:  On a robbery, if you commit this right
here, you say, well, what if the Defendant had a prior conviction, a prior
trip, that would make it worse.  Then he
deserves 20.  No.  If he=s been to the penitentiary before and
committed this offense, five to 99 or life, the robbery. 
Then you look at he=s putting in fear.  You say,
well, okay, wait a minute.  What if they
were seriously injured, serious bodily injury? 
Well, guess what?  That=s aggravated robbery, too, five years to 99
years or life.  (Emphasis added)

 

                                                  Controlling
Authority

In order
to preserve a complaint for appellate review, the objection must be made with Asufficient specificity.@ 
TEX.R.APP.P. 33.1.  A point of
error which Adoes not comport with appellant=s trial objection@ preserves nothing for review.  Harris v. State, 784 S.W.2d 5, 17
(Tex.Cr.App.1989), cert. den=d, 494 U.S. 1090 (1990).








The only
complaint preserved by appellant=s objection, AJudge,
that=s not true. 
It would be a minimum of 15 to life,@ relates to the State=s argument that it had already knocked off 80 years (actually 79 years)
by indicting appellant for robbery instead of aggravated robbery.  The court actually agreed with appellant=s counsel that the minimum penalty for Aaggravated robbery with a prior@ would be 15 years.  See TEX. PENAL CODE ANN. ' 12.42(c)(1) (Vernon 2003). 
There was no request for an instruction to disregard; the general rule
is that, in order to preserve a claim of error during jury argument, Athe defendant must object until receiving an
adverse ruling.@  See,
e.g., Harris v. State, supra at 12.

Moreover,
the prosecutor clarified his argument by making it clear that in this portion
of the argument he was talking about robbery, Athis offense,@ with
a prior.  A different portion of the
State=s argument discussed the punishment for
aggravated robbery; and, in that portion, the State did not refer to a prior
conviction.  There is no showing that
the trial court overruled an objection to any improper jury argument by the
State.  The State had the right to summarize
the evidence and to make a plea for law enforcement.  The record shows that the State did not Ainject new and harmful facts.@  See,
e.g., Shannon v. State, 942 S.W.2d 591, 597 (Tex.Cr.App.1996).  The sole point of error is overruled in all
three appeals. 

                                                                This
Court=s Ruling

The
judgments of the trial court are affirmed.

 

BOB
DICKENSON

SENIOR
JUSTICE

 

May 15, 2003

Do not publish.  See TEX.R.APP.P. 47.2(b).

Panel consists of: Arnot, C.J., and

McCall, J., and Dickenson, S.J.[7]











[1]See TEX. PENAL CODE ANN. '
29.02 (Vernon 2003).





[2]See TEX. PENAL CODE ANN. '
12.33 (Vernon 2003).  The range of
punishment for a felony of the second degree is confinement for not less than 2
nor more than 20 years.  A fine of not
more than $10,000 may also be imposed. 
All three periods of confinement will be served at the same time, and
appellant was given credit for time in custody prior to trial.





[3]No. F-0160443-QHN in the 195th  District Court of Dallas County and No.
11-02-00215-CR on the docket of this court.





[4]No. F-0160444-QHN in the 195th District Court of Dallas
County and No. 11-02-00216-CR on the docket of this court.





[5]No. F-0271184-THN in the 195th District Court of Dallas
County and No. 11-02-00217-CR on the docket of this court. 





[6]See Miranda v. Arizona, 384 U.S. 436 (1966).





[7]Bob Dickenson, Retired Justice, Court of Appeals, 11th
District of Texas at Eastland sitting by assignment.